E-FILED
Friday, 07 April, 2006 11:23:00 AM
Clerk, U.S. District Court, ILCD

FILED
APR 6 2006
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CR06-20023 |
| | ) | |
| vs. | ) | VIOLATION: |
| | ) | Title 18, United States Code, |
| KENTON W. TYLMAN, | ) | Sections 371; |
| BRENT A. WINTERS, | ) | Title 26, United States Code, Sections |
| DEBRA J. HILLS, a/k/a "DEB" HILLS | ) | 7206(1) |
| | ) | |
| Defendants. | ) | |

## INDICTMENT

## COUNT ONE

**THE GRAND JURY CHARGES:**

**CONSPIRACY TO DEFRAUD AN AGENCY OF THE UNITED STATES**

1. Beginning as early as the fall of 1995 and continuing until at least August 2002 in Charleston in the Central District of Illinois and elsewhere, the defendant

**KENTON W. TYLMAN**

unlawfully and knowingly combined, conspired, confederated and agreed with others both known and unknown to the Grand Jury to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the Internal Revenue Service of the U.S. Treasury Department in the due administration of the internal revenue laws in the ascertainment, computation, assessment, and collection of the revenue, namely, federal income taxes.

2. In or about 1998, defendant,

**DEBRA J. HILLS**

and in or about 1999, defendant,

**BRENT A. WINTERS**

joined the conspiracy described in the previous paragraph and unlawfully and knowingly combined, conspired and agreed with each other, with defendant KENTON W. TYLMAN and with others known and unknown to the Grand Jury to defraud the United States in the manner described in the previous paragraph and as further described in the following paragraphs.

MANNER AND MEANS OF THE CONSPIRACY

3. As part of the conspiracy, the defendants and two unindicted co-conspirators created, marketed and sold to taxpayers various financial arrangements. They initially called these arrangements "trusts" or "common law business organizations." These financial arrangements had no economic substance or business purpose. In fact, the taxpayers who participated in the conspiracy retained complete control and enjoyment of all the money they assigned to the supposed "trusts" or "common law business organizations."

4. The financial arrangements the defendants sold were essentially just bank accounts into which taxpayers deposited money and claimed, falsely, that the amounts of the deposits were tax deductible or were earned by another entity. Indeed, the sole purpose of these financial arrangements was to help taxpayers hide income; evade taxes and defraud the IRS.

5. The defendants and two unindicted co-conspirators (referred to collectively hereafter as "the conspirators") typically arranged a series of sham entities for each taxpayer who was willing to evade income taxes. After creating the series of entities for a taxpayer, the conspirators typically instructed the taxpayer to assign some of his or her personal income to a "trust," omit or deduct that amount of income from the taxpayer's personal tax return, and claim that the "trust" had earned that income. The conspirators further instructed each such taxpayer to assign the income from the first "trust" through the series of additional entities, deduct the amount of that transfer from the income of the first "trust," and file no income tax return whatsoever for the entity that ended up with the money. To conceal the true ownership and control of such money, the conspirators sold taxpayers financial arrangements that were purportedly foreign entities, which they called "trusts or international business corporations or companies."

6. After the IRS began auditing tax returns involving such arrangements, the defendants began marketing and selling similar arrangements but called them "limited liability companies" or "limited partnerships."

7. As part of the conspiracy, the defendants created false documents by placing false dates on documents which they signed and caused others to sign and by falsely notarizing or causing fraudulent notarization of documents such as trusts, director appointments, director resignations, director's meeting minutes, and stock certificates.

BACKGROUND OF THE CONSPIRACY

8. In 1995, the defendant KENTON W. TYLMAN began selling "trusts" and related financial arrangements for a company in Palos Hills, Illinois, called The Aegis Company ("Aegis"). The so-called trusts and other financial arrangements that defendant TYLMAN sold

for Aegis were sham trusts, which had no legitimate business purpose other than to conceal income and evade payment of taxes.

9. In 1995, two unindicted individuals joined and conspired with defendant TYLMAN to promote and sell the "trusts" and other financial arrangements that Aegis marketed.

10. In 1998, defendant DEBRA J. HILLS joined the conspiracy, began working with defendant TYLMAN and became a registered representative of Aegis. Defendant HILLS assisted defendant TYLMAN in sales calls, responded to customers' inquiries, and helped create some of the paperwork for the "trust" packages sold to clients.

11. In 1999, defendant BRENT A. WINTERS joined the conspiracy and began working with defendants TYLMAN and HILLS Defendant WINTERS, who was a licensed attorney, prepared some of the paperwork for the various "trusts" packages sold to clients.

12. During 1999 and 2000, defendants TYLMAN, WINTERS and HILLS began promoting and selling their own version of the Aegis "trust" packages. The defendants' packages included sham international business companies, offshore bank accounts, and debit /credit cards which allowed the purchasers of the packages to recover any money they deposited to the offshore accounts.

13. On or about October 29, 1999, in Charleston, Illinois, the defendants organized and held a sales seminar to promote their trusts and common law business organizations.

14. The defendants used the business names of Worldwide Financial Services and Worldwide Financial and Legal Association to promote their "trust" packages.

15. The defendants charged clients as much as $40,000 for their services. Purchasers paid approximately $530,000 to buy trusts, common law business organizations, CBO's. LLC's

and Limited Partnerships.

16. The defendants all benefitted from the sale of trusts and other financial arrangements. Each received a percentage of the purchase price depending on his or her role in the sale. In addition, defendant BRENT A. WINTERS received attorney's fees related to the "trusts" and other arrangements, and defendants KENTON W. TYLMAN and DEBRA J. HILLS received commissions and management fees.

17. As part of the conspiracy, the defendants concealed, misrepresented and hid, and caused to be concealed, misrepresented and hidden, the existence, purpose and acts done in furtherance of the conspiracy.

OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

18. To effect the objects of the conspiracy and accomplish its purpose, the conspirators committed the following overt acts, in which each taxpayer is identified only by a letter of the alphabet and certain "trusts" are identified only by initials.

Taxpayer A

19. In late 1995, defendant TYLMAN and his co-conspirators caused Taxpayer A to pay approximately $14,000 for the purchase of "trusts" and other financial arrangements that the conspirators marketed. The "trusts" that were created for Taxpayer A were called "MEM&V Co. Trust," "W & T Enterprise Ltd. Partnership," "Quanto International Trust," and "Simbano Global Trust."

20. For tax years, 1997, 1998 and 1999, the conspirators caused Taxpayer A to file false and fraudulent tax returns in that Taxpayer A omitted a portion of his earned income from his Form 1040 individual income tax return and, instead, reported that income on the Form 1041

trust tax return of MEM&V Co. Trust. The conspirators and Taxpayer A caused the tax return for that "trust" to report that its income had been distributed to Quanto International Trust, which, in turn, declared that the funds had been distributed to Simbano Global Trust. Simbano Global Trust filed no tax return and paid no income taxes.

Taxpayer B

21. On or about December 1, 1999, the conspirators caused Taxpayer B to pay $5,000 to them to create a purported "charitable trust," to which Taxpayer B could deposit funds, maintain unrestricted control of the funds and yet could declare, falsely, that the deposits were charitable contributions. That same day, defendant BRENT A. WINTERS created "Taxpayer B Charitable Trust."

22. On or about March 9, 2000, the conspirators caused Taxpayer B to claim a false charitable deduction of $11,957 on his 1999 Form 1040, and on or about March 28, 2001, the conspirators caused Taxpayer B to claim a false charitable deduction of $12,982 on his 2000 Form 1040.

Taxpayer C

23. On or about December 5, 1995, the conspirators caused Taxpayer C to agree to pay a total of $25,000 and to actually pay that day $12,500 for the purchase of a purported "asset management company" and two "trusts," which were named "Ornest International Trust" and "The Libera Global Trust."

24. On or about December 6, 1995, the conspirators caused the creator of the purported asset management company to resign as Director and named Taxpayer C as Director, thereby enabling Taxpayer C to maintain complete control over all of the property placed in any trust

managed by the company.

25. On or about April 15, of tax years 1996, 1997, 1998 and 1999, the conspirators caused Taxpayer C to file false and fraudulent income tax returns with the IRS, including Form 1040 Individual Income Tax Return and Form 1041 U. S. Income Tax Return for Estates and Trusts. Taxpayer C claimed that a portion of his income, which should have been listed as income on his personal tax return, was instead income of the management company. The tax return filed for the management company reported that the income had been distributed to Ornest International Trust, which, in turn, claimed to have distributed those funds to The Libera Global Trust. The Libera Global Trust filed no tax return and paid no income taxes.

Taxpayer D

26. On or about December 26, 1995, the conspirators caused Taxpayer D to pay $25,000 for the purchase of a purported asset management company and two "trusts," which were named "The Nickolet International Trust" and "Starby Global Trust."

27. On or about September 3, 1996, defendant KENTON W. TYLMAN accompanied Taxpayer D to First of America Bank, Mattoon, Illinois, and helped him open bank accounts for Nickolet International Trust and Starby Global Trust. Defendant KENTON W. TYLMAN caused Taxpayer D to falsely claim foreign status for both entities.

28. On or about April 15, for tax years 1996, 1997, 1998 and 1999, the conspirators caused Taxpayer D to file false and fraudulent income tax returns with the IRS, including Form 1040 Individual Income Tax Return and Form 1041 U. S. Income Tax Return for Estates and Trusts. Taxpayer D claimed that a portion of his income, which should have been listed as income on his personal tax return, was instead declared as income of the purported management

company. The tax return of the management company reported that the money had been distributed to the Nickolet International Trust, which in turn, claimed to have distributed the income to Starby Global Trust. Starby Global Trust filed no tax return and paid no income taxes.

Taxpayer E

29. Between March 8, 1996, and April 11, 1996, the conspirators caused Taxpayer E to pay $25,000 for the purchase of "J. C. Asset Management Trust," "Disalt International Trust," "The Inventio Services Company, Limited," and "Nativa Global Trust." At the time of creation, an unindicted co-conspirator who was an attorney was listed as creator of J. C. Asset Management Trust.

30. On or about March 3, 1996, the conspirators caused the creator of J. C. Asset Management Trust to resign and name Taxpayer E as Director of the trust, thus giving Taxpayer E control of the trust assets.

31. On or about April 15, 1997, the conspirators caused Taxpayer E to file a false and fraudulent income tax return, namely a Form 1040 Individual Income Tax Return for the 1996 tax year in that he failed to report $164,000 from the sale of his business. Taxpayer E reported the gain from the sale of his business on a Form 1041 U. S. Income Tax Return for Estates and Trusts for the J. C. Asset Management Trust, which, in turn, filed a tax return which reported that the income had been distributed to The Disalt International Trust. The Disalt International Trust filed a Form 1040 NR Nonresident Alien Income Tax Return and decreased the amount of total income received by claiming a $12,500 expense against the funds distributed by J. C. Asset Management Trust. Disalt International Trust reported that it distributed the remaining income amount to Nativa Global Trust. The Nativa Global Trust filed no tax return and paid no income

taxes.

Taxpayer F

32. On or about March 22, 1999, the conspirators caused Taxpayer F to pay them $40,000 for the purchase of "KMC Asset Management Trust," "Acres Trust," "CAAB LLC," "KSDD Asset Management Trust," "ABK Ltd Partnership," "KSDD Services Company, Limited, Belmopan, Belize," and "EIEIO International Trust, Belmopan, Belize."

33. To fraudulently make it appear that the Board of Directors of KMC Asset Management Company met on January 12, 1999, January 13, 1999, and January 14, 1999, defendants KENTON W. TYLMAN and DEBRA J. HILLS caused three separate Directors' Minutes to be created, all falsely bearing dates in January 1999, all falsely witnessed by DEBRA J. HILLS and all falsely notarized by KENTON W. TYLMAN.

34. On or about July 20, 1999, defendants KENTON W. TYLMAN and DEBRA J. HILLS assisted and caused Taxpayer F to set up accounts at Swiss American Bank in Antigua, into which funds from EIEIO International Trust and KSDD Services Company, Limited, were deposited and concealed from the IRS.

35. On or about April 10, 2000, the defendants caused Taxpayer F to file false and fraudulent income tax returns with the IRS, including a Form 1040 U.S. Individual Income Tax Return, and a Form 1041 U.S. Income Tax return for Estates and Trusts, on which Taxpayer F claimed that a portion of income that should have been listed as income on Taxpayer F's personal tax return, was instead income of KMC Asset Management Trust's tax return. KMC Asset Management Trust reported that it distributed the income to EIEIO International Trust, which, in turn, filed a Form 1040 NR Nonresident Alien Income Tax Return and claimed to have

distributed the income to KSDD Service Company Limited. KSDD Service Company Limited filed no tax return and paid no taxes.

Taxpayer G

36. Between December 1998 and approximately April 1999, the conspirators caused Taxpayer G to pay $26,000 to create "Quick Lease Trust," "KEW Limited Partnership," and "The Cessure International Trust," of which "Lator Services Company, Ltd., Belmopan, Belize," had power of attorney. The conspirators completed and caused paperwork to be completed to establish accounts at Swiss American Bank, Antigua, for Lator Services Company, Ltd., and The Cessure International Trust.

37. In or about January 1999, defendants KENTON W. TYLMAN and DEBRA J. HILLS together visited the residence of Taxpayer G to obtain signatures on trust documents and other documents related to the entities the conspirators sold. The documents KENTON W. TYLMAN and DEBRA J. HILLS produced for signature were false. They included records of the first meeting of Quick Lease Trust Board of Directors, which was recorded as being held October 1, 1999. The Board of Directors meeting was fictional. The Quick Lease Trust Board never met.

38. On or about October 1, 1999, defendant BRENT A. WINTERS prepared and drafted a warranty deed to transfer a real estate asset from Taxpayer G to the Quick Lease Trust, thus hiding Taxpayer G's ownership of the real estate. In fact, the Quick Lease Trust was part of the system set up by KENTON W. TYLMAN and DEBRA J. HILLS to reduce Taxpayer G's taxes.

Taxpayer H

39. On or about March 10, 1999, defendant DEBRA J. HILLS created "The Namlyt

Trust" for the use and benefit of Taxpayer H.

40. According to the official Namlyt Trust Board of Directors minutes, the Board purportedly met for the first time that very day – March 10, 1999 – at the Offices of Worldwide Financial Services. The minutes reflected the presence of DEBRA J. HILLS. The Namlyt Trust Board of Director purportedly met for the second time on March 12, 1999, also at Worldwide Financial Services. The minutes of the second meeting reflect that DEBRA J. HILLS "resigned" as Director of the Namlyt Trust, and appointed Taxpayer H as director. Actually, both such meetings were a fiction; the meetings never took place.

41. Documents associated with The Namlyt Trust, including Assignment, Units of Beneficial Interest, and Notice of Appointment and Resignation, were falsely notarized to make it appear that Taxpayer H had appeared before DEBRA J. HILLS, a notary public, to sign the documents. In fact, the documents were not signed in her presence.

Taxpayer I

42. On or about April 19, 1999, the conspirators caused Taxpayer I to pay their company $34,000 to create "The Felicity Trust," "Xanadu International Trust," and "TBK, Services Company, Limited," to conceal the true ownership of insurance proceeds. That same day, defendant BRENT A. WINTERS created "The Felicity Trust," defendant KENTON W. TYLMAN witnessed the signatures on "trust" documents, and defendant DEBRA J. HILLS notarized the signatures.

43. Between April 1999 and August 1999, defendant BRENT A. WINTERS signed documents which falsely stated that meetings of The Felicity Trust Board of Directors were held on April 19, April 22, and April 26, 1999. In fact, all three of the meetings were a fiction and

never took place.

44. In approximately July 1999, the conspirators caused Taxpayer I to set up two accounts at Swiss America Bank, Antigua, in the name TBK Services Company, Limited; Taxpayer I had access to funds in the Swiss America Bank by means of debit card, credit card and wire transfer.

45. On or about November 1999, Taxpayer I wired life insurance proceeds of approximately 1.2 million off shore to the TBK Services bank account in Antigua. In an effort to conceal Taxpayer I's ownership of the money, these proceeds were then transferred back to the United States into the Felicity Trust Bank account, and the money was transferred into five investment accounts in the name of Felicity Trust.

46. The defendants caused Taxpayer I to defraud the IRS for tax years 1999 and 2000. Taxpayer I's Felicity Trust accounts earned interest, dividends, and capital gains that were subject to taxes, but Taxpayer I failed to file a Form 1040 Individual Income Tax Return. Neither the Felicity Trust nor TBK International Company, Limited filed tax returns or paid income taxes.

Taxpayer J

47. On or about October 8, 1999, Taxpayer J paid $1,200 to BRENT A. WINTERS to purchase "Professional Financial Solutions Trust" with the understanding that he could use the trust to reduce his income taxes.

48. BRENT A. WINTERS caused Taxpayer J to obtain a document entitled "Business Trust Company Organization; Professional Financial Solutions," notarized by KENTON W. TYLMAN. To conceal Taxpayer J's control of the trust, the document was drafted so Taxpayer

J's father's name appeared as the creator. Taxpayer J never signed the trust documents and Taxpayer J's father never signed the trust documents as trust creator. KENTON W. TYLMAN fraudulently notarized Taxpayer J's father's appearance and signature as creator of the trust.

Taxpayer K

49. On or about January 3, 2000, Taxpayer K paid $40,000 from his Decatur Earthmover Credit Union account to the defendants' business account at First National Bank of Toledo to purchase "Suahein Trust," and "N. C., LLC." The name on the defendants' business account was then "Worldwide Financial and Legal Association" (WFLA").

50. On or about January 5, 2000, the conspirators caused $40,000 from the WFLA bank account at First National Bank of Toledo to be deposited to N C's Decatur Earthmover Credit Union account.

51. In or about April 2000, Taxpayer K withdrew $39,950 from his self-directed IRA at Mid-Ohio Securities, now known as Equity Trust Company, and purportedly "invested" these funds with WFLA. The money was deposited to the WFLA account at First National Bank of Toledo.

52. On or about May 22, 2000, BRENT A. WINTERS, as witness, provided Taxpayer K a fraudulent promissory note documenting that Taxpayer K had loaned $39,950 to WFLA. That promissory note committed WFLA to repay $39,950 to Taxpayer K's self-directed IRA. That arrangement and documentation was intended to fraudulently prevent the IRS from imposing a monetary penalty on Taxpayer K for an illegal withdrawal of funds from his IRA account before the age of 59 ½..

53. After purchasing the "trusts" from the defendants, Taxpayer K then transferred his

business into a purported "limited liability company" which taxpayer K created "ECC, LLC." As a result, the entity ECC, LLC purportedly received approximately $33,104 of income for the 2001 tax year, approximately $157,073 of income for the 2002 tax year, and approximately $170,340 of income for the 2003 tax year. All of that money was reported on Forms 1099 as income for ECC, LLC, but no person or entity paid any taxes on the income because ECC, LLC filed no tax return and paid no taxes.

Taxpayer L

54. On or about October 21, 1999, Taxpayer L paid $40,000 to one of the defendants' business entities named "Worldwide Financial Services"("WFS") for the purchase of "K Company Trust," "REM Trust," "S Foundation Trust," "S Limited Partnership" and "K Company, LLC." The defendants failed to timely provide Taxpayer L with any documentation of the entities he had purchased.

55. On or about May 24, 2001, DEBRA J. HILLS provided Taxpayer L with documents related to K Company Trust, REM Trust, S Foundation Trust and S Limited Partnership, together with ten pages of instructions on where to sign and what date to place on each document. DEBRA J. HILLS instructed Taxpayer L to fraudulently date documents back to the dates on which the documents should have been created and signed.

56. Taxpayer L caused some of his personal income to be assigned to REM Company Trust. REM Company Trust distributed its income to K Company, LLC, and to S Foundation Trust. K Company, LLC, distributed 98% of its purported income to S Foundation Trust and the S Foundation Trust filed a tax return for a private foundation and paid no income tax on the income distributed from K Company, LLC, or on contributions received directly from Taxpayer

L for which he took a false deduction on his Form 1040 personal tax return.

Taxpayer M

57. On or about September 2, 1999, Taxpayer M paid $40,000 to WFS to purchase a trust system which included using the following entities: "PDK Company Trust," "Zrek Services Company Ltd.," "CV Business Company" and " LAB International Trust."

58. Defendant BRENT A. WINTERS created PDK Company Trust and CV Business Company with no creation date, no date of witnessing and no notarization date. Defendant KENTON W. TYLMAN witnessed the creation of the trust and the company, and DEBRA J. HILLS notarized the documents. The defendants caused Taxpayer M to assign all of his equity in property, both real and personal, to PDK Company Trust, with no date noted for document creation or signature by any party.

59. On an undated document notarized by defendant DEBRA J. HILLS, defendant BRENT A. WINTERS resigned as Director of PDK Company Trust and appointed Taxpayer M as Director, thus returning complete power and authority over all trust property, real and personal, to Taxpayer M.

60. With assistance from the defendants, Taxpayer M opened two trust bank accounts in the names The Zrek Services Company Ltd. and LAB International Trust. Both accounts were at Swiss American Bank., Ltd., Antigua. The defendants also assisted the taxpayer in establishing a credit card account at Swiss American Bank in the name of Zrek Services Company, Ltd.

61. On or about the dates set forth below, as a result of the conspirators' marketing and promotion of trusts and other entities intended to conceal funds and fraudulently reduce taxes, the conspirators caused and assisted the following taxpayers to file false and fraudulent tax returns

listing the following amounts of total income and omitting approximately the below-listed amounts of income for the tax years identified for the tax years identified:

| Taxpayer | Tax Year | Return | Date Filed On or About | Total Income Line 22 Form 1040 | Approximate Income Omitted |
|---|---|---|---|---|---|
| A. | 1997 | 1040 | 04/15/98 | $ 31,026 | $ 121,095 |
| A | 1998 | 1040 | 04/15/99 | $ 41,962 | $ 277,000 |
| A | 1999 | 1040 | 04/17/00 | $ 55,708 | $ 340,000 |
| C | 1996 | 1040 | 03/26/97 | $ 71,779 | $ 624,500 |
| C | 1997 | 1040 | 04/12/98 | $ 10,800 | $ 506,400 |
| C | 1998 | 1040 | 04/12/99 | $ 19,203 | $ 786,400 |
| C | 1999 | 1040 | 04/12/00 | $ 7,405 | $3,169,500 |
| E | 1996 | 1040 | 04/15/97 | $ 33,005 | $ 190,000 |
| D | 1996 | 1040 | 04/15/97 | $ 66,937 | $ 64,578 |
| D | 1997 | 1040 | 04/15/98 | $ 45,037 | $ 218,000 |
| D | 1998 | 1040 | 04/15/99 | $ 44,532 | $ 249,000 |
| D | 1999 | 1040 | 04/17/00 | $ 65,412 | $ 347,000 |

| Taxpayer | Tax Year | Return | Date Filed On or About | Taxable Income Line 39 Form 1040 | Approximate Income Omitted |
|---|---|---|---|---|---|
| L | 2000 | 1040 | 10/04/01 | $125,334 | $ 86,000 |
| B | 1999 | 1040 | 04/15/00 | $26,598 | $ 8,621 |
| B | 2000 | 1040 | 03/28/01 | $25,017 | $ 9,782 |

| | | | | | |
|---|---|---|---|---|---|
| I | 1999 | 1040 | N/A | N/A | $ 29,648 |
| I | 2000 | 1040 | N/A | N/A | $ 65,113 |
| F | 1999 | 1040 | 04/10/00 | $18,379 | $ 206,221 |
| TOTAL: | | | | | $7,298,858 |

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES:**

**FILING A FALSE TAX RETURN**

1. In tax year 2000, DEBRA J. HILLS was a principal of both Worldwide Financial Services and Worldwide Financial and Legal Association. DEBRA J. HILLS received income by check from both entities and caused those checks to be deposited either to an account at Citizens National Bank in the name of a so-called "asset management company" bearing her initials, "DJH," or to an account at First Mid-Illinois Bank and Trust in the name of Debra J. Hills and another person.

2. Defendant DEBRA J. HILLS failed to include the income from these two named sources on her income tax return for tax year 2000.

3. On or about July, 29, 2002, defendant

**DEBRA J. HILLS,**

who was then a resident of Ashmore, Illinois, in the Central District of Illinois, did willfully make, subscribe and file with the Internal Revenue Service a false and fraudulent Form 1040 U.S. Individual Income Tax Return for calendar year 2000, which return was verified by a written declaration that it was made under the penalties of perjury, and which return the defendant did not believe was true and correct as to every material matter in that she reported her total income on line 22 to be $194.00 when, in fact, as the defendant then knew and believed, her total income was approximately $18,000 more than she reported;

In violation of Title 26, United States Code, Section 7206(1).

**COUNT THREE**

**THE GRAND JURY FURTHER CHARGES:**

**FILING A FALSE TAX RETURN**

1. In 1998, defendant BRENT A. WINTERS was a candidate for the U.S. House of Representatives.

2. Defendant WINTERS established a campaign fund called "Committee to Elect Winters to Congress," and he personally loaned at least $36,616.50 to his campaign fund.

3. Following his unsuccessful campaign, defendant WINTERS knew that his campaign fund would not repay his loan and that the $36,616.50 debt was uncollectible.

4. At all times relevant to this indictment, defendant WINTERS was an attorney who was licensed to practice in Illinois; he was familiar with the tax laws of the United States that prohibited taxpayers from deducting as losses on their tax returns any uncollectible loans to campaign funds.

5. On or bout November 17, 1998, to create a false and fraudulent tax deduction for the uncollectible loan to his campaign fund, defendant WINTERS supposedly "sold" the $36,616.50 debt to a "trust" called "American Land and Mines Company" for $2,500 and suffered a supposed loss of approximately $34,117.

6. American Land and Mines Company had no business purpose. It was established simply to create the false appearance that assets belonging to WINTERS were controlled by a separate entity. In fact, defendant WINTERS himself controlled American Land and Mines Company.

7. On or about April 6, 2000,

**BRENT A. WINTERS,**

defendant herein, a resident of Charleston, Illinois, in the Central District of Illinois, did willfully make, subscribe and file with the Internal Revenue Service a false and fraudulent Form 1040 Joint U.S. Individual Income Tax Return for calendar year 1998, which tax return was verified by a written declaration that it was made under the penalties of perjury and which return the defendant did not believe to be true and correct as to every material matter, in that Schedule D (Capital Gains and Losses) reported a capital loss of $34,117, when in fact as the defendant then well knew and believed, that loss resulted from an uncollectible loan he made to his campaign fund, that loss was not deductible, and the supposed "sale" of the uncollectible debt to a "trust" was fraudulent.

In violation of Title 26, United States Code, Section 7206(1).

A TRUE BILL.

s/Foreperson

FOREPERSON

s/Gregory Harris for

RODGER A. HEATON
United States Attorney