# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-20023 |
| ) | |
| KENTON W. TYLMAN, BRENT WINTERS, ) | |
| DEBRA J. HILLS, ) | |
| ) | |
| Defendants. ) | |

# O R D E R

This matter is now before the Court on Defendants' Motion to Suppress and Subpart A of Winters' Motion to Dismiss the Indictment With Prejudice.  For the reasons set forth below, the Motion to Suppress [#54] is DENIED, and Subpart A of Winters' Motion to Dismiss [#47], which is essentially duplicative of the Motion to Suppress, is also DENIED.

## BACKGROUND

During the late 1990's and into 2000, IRS agents in the Northern District of Illinois were conducting an investigation of Aegis Financial Group ("Aegis"), a company based in Palos Hills, Illinois, with respect to its role in marketing a system of trusts used in an alleged conspiracy to defraud the IRS of millions of dollars in income taxes.  The investigation of Aegis led IRS agents to the Central District of Illinois and the offices of Worldwide Financial Services ("WFS").  This criminal prosecution follows the search of WFS' business premises at 913 17th Street, Charleston, Illinois, on March 31, 2000.

At approximately 10:30-10:45 a.m. that morning, IRS agents entered WFS' office building to execute the federal search warrant.  Upon entering the office through two

unlocked doors, agents announced their presence and found Defendants Ken Tylman ("Tylman"), Brent Winters ("Winters"), and Debra Hills ("Hills") in a conference room; Harry Woolen ("Woolen") was also present in the conference room.  The agents proceeded to secure the premises, and in the process noted that the diagram that they had received from the undercover agent was no longer accurate because of remodeling of the general area into separate offices and several common areas.  That being said, despite Defendants arguments to the contrary, all indications at the time that the agents entered the building were that the area  represented one integrated business.  None of the offices had any signage, labels, or other indicia that they constituted separate businesses.  The only business sign at the building was a sign for WFS that appeared in an exterior window near the front door of the building.  There was also evidence of common computer networking and use of the common areas.

After receiving a copy of the warrant, Tylman and Winters objected that there was no list of items to be seized.  Agent Bernard Coleman ("Coleman"), who was in charge of the search, consulted supervisory agents in Chicago and was advised that he should obtain a new warrant before proceeding with the search.  While a second warrant was obtained, the agents maintained control of the premises to preserve the status quo and prevent the destruction of evidence.  The agents videotaped and diagramed the offices, traced computer cables, and labeled file cabinets while they were waiting, but there is no persuasive evidence indicating that they conducted a search in any meaningful way during that time.  Defendants were told that they were free to leave, and both Hills and Woolen did so.  As evidenced by the testimony of the agents and a videotape made that day,

Defendants were also free to move around the offices, albeit with supervision by agents scattered throughout the premises.

At approximately 2:43 p.m. that afternoon, the second search warrant arrived.  The second warrant contained an attached list of items to be seized.  However, Tylman was quick to point out that the attached list was the wrong list and did not apply to his property. Rather, the list identified items to be seized in a search of Aegis offices located more than 100 miles away.  After again consulting with a supervisory agent, Coleman returned to the courthouse for yet another warrant while the agents continued to secure the premises.

The third warrant arrived around 5:35 p.m. with the proper list of items to be seized attached to the warrant.  Agent Don Staggs ("Staggs") handed a copy of the warrant and list to Winters, and the agents began conducting the search.  The items seized were listed in an inventory, a copy of which was left with Tylman and Winters.  As there was insufficient time to image the computer hard drives on site, agents seized the computers for examination off site.  With the exception of one older Gateway computer, the computers were imaged and returned within a few business days.

Tylman, Hills, Woolen, and James McNutt ("McNutt"), another individual renting space in the WFS building, subsequently filed a motion seeking the return of their property and the suppression of evidence pursuant to Federal Rule of Criminal Procedure 41(e). (Case Nos. 00-U-13, 00-U-14, and 00-U-15)   Judge Michael McCuskey ordered the Government to return copies of the seized documents and denied other requested relief. Unsatisfied with this outcome, the petitioners appealed.   After acknowledging that no indictment had yet been filed, the Court of Appeals found that any attempt to seek suppression of evidence was premature and affirmed the ruling with respect to the return

of copies.  In re: Search of the Office of Ken Tylman, Worldwide Financial Services, 913 17th Street, Charleston, IL 61920, 245 F.3d 978, 981 (7th Cir. 2001)

On April 6, 2006, an Indictment issued against Tylman, Winters, and Hills charging all three of them with conspiracy to defraud the IRS, as well as charging Hills and Winters with filing false tax returns.  Superceding Indictments issued on August 3, 2006, and June 6, 2007.  After initially presiding in this case, Judge McCuskey recused himself, and the matter was reassigned to this Court.

Defendants filed the present motions seeking to suppress the evidence that was obtained during the March 31, 2000, search.  The Government requested that the Court adopt previous findings of fact made by Judge McCuskey and the Court of Appeals.  This request was denied based on the Court's determination that the parties were entitled to a de novo examination.   Following what amounts to three days of evidentiary hearings on this issue, this Order follows.

**DISCUSSION**

In a Fourth Amendment claim, the decision of whether a search or seizure is reasonable is  intensely fact driven and should be determined based on the totality of the circumstances.  *See* South Dakota v. Opperman, 428 U.S. 364, 373 (1976); U.S. v. Griffin, 729 F.2d 475, 485 (7th Cir. 1984).  If a search or seizure is found to be in violation of the Fourth Amendment, the evidence obtained from the illegal search or seizure may be properly suppressed via the exclusionary rule.  *See* Arizona v. Evans, 514 U.S. 1, 11 (1995); U.S. v. Duguay, 93 F.3d 346, 354 (7th Cir. 1996).  However, the suppression of evidence is an extraordinary remedy that is to be used as a last resort to efficaciously serve its remedial purpose.  United States v. Calandra, 414 U.S. 338, 348 (1974).

- 4 -

A.    <u>Errors in Search Warrant Files</u>

Defendants spent a great deal of time arguing that the three official search warrant files are not in the proper order, suggesting that there is some sinister reason or Government misconduct behind the problem.  After reviewing the files themselves and hearing testimony on this question, there is no doubt that the files are not in the proper order.  While resolving this issue does require some assessment of credibility, the Court notes that it would be nonsensical for the Government to have deliberately shuffled the files, as it would only serve to further complicate an already complex case and breed the kind of acrimonious allegations that the Court is now asked to resolve.

The files are not kept by the Government.  Rather, the U.S. Clerk's Office is responsible for keeping and maintaining the official court file.  In this case, the search warrant files were kept and handled by the clerk's offices in both the district court and the Court of Appeals.   Unfortunately, it is not uncommon for documents to get out of order in the process of preparing the record for appeal, reviewing the record,  making copies requested by court staff or counsel, or returning the record to the court files following an appeal.  Based on the evidence presented, the only reasonable conclusion is that this is precisely what happened to the files in this case.  Any misfiling resulting therefrom was harmless and inadvertent.

B.    <u>Appearance of White Out on Attachment B</u>

Defendants suggest some impropriety from the fact that there is white out on the heading of Attachment B appended to the third search warrant and that the font of the letter "B" on that attachment appears different from the letter "B" on Attachment B to the second search warrant.  With all due respect, the Court finds this issue to be a red herring that has

no bearing on the real question of whether there was in fact an Attachment B appended to the third search warrant.  The agents were compiling different attachments coming from different sources that day, and the fact that one attachment had to be amended to comport with the other documents being prepared is simply a non-issue.

        C.    <u>Knock and Announce Violation</u>

Defendants argue at length that suppression is warranted because the agents violated the "knock and announce" requirement and had not obtained a "no knock" warrant. However, this is not a "no knock" situation.  The clear and uncontroverted evidence of record is that the agents entered a place of business through an unlocked door during normal business hours.  Under these circumstances, the Court finds that although Agent Coleman did announce their presence upon entry, the agents had no duty to knock and announce before entering.  Defendants have not cited and the Court is otherwise unaware of any binding precedent directing a different result.  Moreover, even assuming *arguendo* that a knock and announce violation occurred, suppression is not justified pursuant to <u>Hudson v. Michigan</u>, 126 S.Ct. 2159, 2168 (2006) and <u>United States v. Langford</u>, 314 F.3d 892, 894-95 (7th Cir. 2002).

        D.    <u>Search/Seizure Under First or Second Warrants</u>

The record reveals that no meaningful search was conducted under either the first or second warrants.  *See also,* <u>In re: Search of the Office of Ken Tylman, Worldwide Financial Services, 913 17th Street, Charleston, IL 61920</u>, 245 F.3d 978, 979 (7th Cir. 2001) (noting that videotaping, diagraming, and labeling file cabinets did not constitute a search.) Accordingly, it necessarily follows that no items were seized pursuant to a search that did

not occur.  This was properly reflected on the returns for the first and second warrants, and the Court finds no material issue here.

      E.    <u>Computer Screens</u>

In support of their contention that the agents impermissibly searched their computer systems prior to the arrival of the third warrant, Defendants point to portions of the videotape made that day.  Review of the tape revealed that earlier in the day, the computer screens appeared to be dark, while later in the day but prior to the arrival of the third warrant, the screens were lit with either a log-in screen or desktop icons visible.  From this, Defendants conclude that the agents must have impermissibly searched some of the computers.

Initially, the Court notes that the only computers that showed anything other than a blank screen belonged to Hills and McNutt.  As McNutt is not a party to this criminal proceeding, Defendants lack standing to make any challenge with respect to his computer. Moreover, the fact that Hills' computer may have displayed a log-in screen does not in any way indicate that her computer was searched.  To the contrary, it would suggest that it was not possible to have obtained any information from her computer at that time because it was password protected.  Agent Stephen Tinsley ("Tinsley"), the agent charged with obtaining evidence from the computers during this search, testified that the fact that a monitor appeared to be black was not indicative of whether the computer was on or off at the time, as it could be indicative of a blank screen saver.  (6/26/07 Transcript at 109) He also stated that he never turned on a computer, touched a space bar or anything to any of the computers prior to the arrival of the third warrant.  (<u>Id.</u>, at 120)  Thus, there is no basis for finding that there was any evidence obtained from any of Defendants' computers prior

to the arrival of the third warrant that day.  The Court finds that testimony credible for purposes of this hearing.

Furthermore, according to the unrefuted testimony of Tinsley, the computers were not searched at all that day.  Rather, they were seized and taken off site where the hard drives were imaged before being returned to the Defendants.  (Id., at 121-25) This argument is therefore without merit.[1]

F.     Searching Drawers

Defendants argue that agents rummaged through file or desk drawers prior to the arrival of the third warrant.  However, this assertion is simply not supported by the record.  At the evidentiary hearing, Tylman pointed to pictures of file cabinet drawers on the videotape made the day of the search and suggested that some drawers were slightly open.  In reviewing the videotape, the Court did not observe that any of the file drawers were open or noticeably ajar, and even assuming that they had been, it was not established when they were opened or by whom, much less that they were opened for purposes of conducting a search prior to the arrival of the third warrant.

G.     Securing the Building

Defendants maintain that the agents had no authority to enter or remain in the building prior to the arrival of the third warrant.  The agents entered at approximately 10:30-10:45 a.m. with the intent to execute the first warrant.  After they had entered and conducted a protective sweep of the building, they were advised that the first warrant would

---

[1]Defendants make a similar argument with respect to Winters' office door.  At various times on the videotape, his office door is either open or closed.  However, the record is devoid of evidence indicating who opened the door, and the fact that a door may have been opened by an agent does not establish that any search of that office occurred.

not be executed and that a new warrant would be obtained.  The agents then remained in the building to preserve the status quo and prevent the possible destruction of evidence until approximately 5:30 p.m. that evening, when the third search warrant arrived.

There is some question as to whether the first warrant was invalid, as the list of items to be seized was not attached.  However, the Court need not resolve that question in order to address the broader issue of whether the agents had authority to enter and remain on the premises for seven hours.  Even when the record is construed in the light most favorable to the Defendants, the agents were justified in remaining on the premises while the new warrants were obtained.  There is no question that the Magistrate Judge had sufficient information to find probable cause and lawfully issue a warrant to search the business premises at 913 17th Street, based on the information provided by the undercover agent as reflected in the affidavit in support of the application for search warrant.  The entry into the WFS offices did not contribute in any way to the discovery of evidence seized under the third warrant, as the information from the undercover agent provided an independent source for the warrants that ultimately issued.  Thus, even if the initial entry with the first warrant unaccompanied by the list of items to be seized could be deemed illegal, the agents were authorized to secure the premises to prevent the destruction of evidence while a warrant was obtained pursuant to Segura v. United States, 468 U.S. 796, 805-15 (1984), because the probable cause was based on independent evidence obtained prior to the allegedly illegal entry, and the discovery of the evidence was inevitable.

The Supreme Court has noted "the Fourth Amendment protects people, not places." Id., at 810, *citing* Katz v. United States, 389 U.S. 347, 351 (1967).  With this in mind, the Court went on to hold that "a seizure affects only possessory interests, not privacy interests."  Id.  Accordingly, the heightened protection accorded to privacy interests "is simply not implicated where a seizure of premises, not a search, is at issue."  Id.  Here, the agents seized the premises but did not conduct a search prior to the arrival of the third warrant.  As such, Defendants' privacy interests were not at issue prior to the arrival of the third warrant.  Like the situation in Segura, the Court finds that the seizure of the business premises "on the basis of probable cause, to prevent the destruction or removal of evidence" that was effected here while the agents attempted to obtain a proper warrant was reasonable under the totality of the circumstances.  Id.

H.    Arrest Claim

Defendants claim that they were placed under arrest during the time that the agents were obtaining and executing the search warrants.  It is crystal clear from the record that Defendants were never placed under arrest.  The proper question is whether their persons were seized within the meaning of the Fourth Amendment.  A seizure has occurred for these purposes "whenever a police officer accosts an individual and restrains his freedom to walk away."  Terry v. Ohio, 392 U.S. 1, 16 (1968).  "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may be conclude that a 'seizure' has occurred."  Id.; United States v. Bradley, 196 F.3d 762, 767 (7th Cir. 1999).

- 10 -

Here, Defendants have admitted that they were told by agents and knew that they were free to leave the premises.  (Suppression Hearing Brief at ¶ 44)  Hills testified that she did so when she left and went home.  The fact that "they chose to remain in the building to protect their interests" is the antithesis of a seizure.  The claim of Winters and Tylman that they were sequestered to the lobby the entire time that the agents were present is belied by the videotape footage showing them moving about within the office (albeit with supervision) and together in Tylman's office prior to the arrival of the third warrant.  They complain that they were not allowed to access their computers or files and were not allowed to roam the office while the search was actively in progress, but such access would have been directly contrary to the agent's legitimate interests in preventing the destruction of evidence, ensuring officer safety, and facilitating the orderly completion of the search.  The Court is unaware of any law that would require such access.

I.   Use of Stale Sketch

The third warrant was obtained using basically the same application as had been used with respect to the first warrant.  However, Attachment A, which was the sketch of the business premises, was omitted.  Defendants argue that the sketch was omitted because by that time, the agents knew that the layout of the building was somewhat different from that depicted in the sketch.  They then contend that the agents had a duty to inform the Magistrate Judge that the building had since been remodeled to divide the area into separate offices.  This is arguably the most serious challenge to the legality of the third search warrant.

Under different circumstances, the agents' failure to inform the Magistrate Judge of the changes could have been fatal. However, under the circumstances of this case, the verifiable facts remained essentially indicative of one integrated business. There was one exterior sign indicating that the building was WFS' office; there were no separate signs indicating that the building was also an office for an independent security business or an independent investment broker or an independent typing service. There were no differentiating signs or labels on any of the separate office doors, and there were areas that were obviously for common use. Upon the agents' arrival, four of the five occupants of the building were in the conference room for a presentation on trusts, and there was visible evidence of computer networking among the computer terminals. Accordingly, while the Court finds that the better course would have been to have informed the Magistrate Judge of the changes in the interior layout of the building, this omission does not render the third warrant invalid because the information that they possessed when they went to secure the third warrant did not change their belief that the premises they wanted to search contained one integrated business.

Winters also speculates that the agents acknowledged that he was operating as a separate business entity because they did not search his office pursuant to the warrant. While Winters certainly did protest that he was not a part of WFS that day, all appearances were to the contrary. Additionally, the undercover agent had indicated that Tylman worked with a lawyer in Charleston, and Tylman had identified Winters as his lawyer shortly after the agents entered the conference room that morning. The record indicates that Agent Coleman was advised not to search Winters' office because he was an attorney asserting

claims of privilege, rather than because there was any belief that he was not involved in WFS' allegedly fraudulent activity.  Rather than showing that the agents acted improperly, this situation demonstrates forbearance by the agents, as there is a strong argument that they had the authority to search his office in any event.

J.    Copy of Warrant and List

Winters and Tylman next assert that they were never given a copy of the third warrant or the list of items to be seized.  While it may be correct that Tylman was not personally handed a copy of the warrant and list, his claim is somewhat disingenuous, as Staggs testified that he advised Tylman and Winters of the new warrant and handed a copy of the third warrant and list of items to be seized to Winters, who had introduced himself as an attorney and who was clearly providing Tylman with legal advice with respect to the warrants.  (6/26/07 Transcript at 56)  Given that the reason for the delay in searching and the purpose of obtaining the second and third warrants was to address the objections posed by Tylman and Winters  and to be able to present them with a detailed list of items to be seized accompanying the warrant, the suggestion that the agents would have gone to the trouble of obtaining three warrants but never gave them a copy of the warrant or that they were given a copy of the warrant but no accompanying list makes no sense.  The Court therefore finds the testimony of Staggs on this point to be more credible.

K.    Failure to Incorporate By Reference

Defendants argue that the third warrant was invalid because it did not incorporate the list of items to be seized on its face.  In support of this argument, Defendants cite Groh v. Ramirez, 540 U.S. 551 (2004), United States v. Gusan, 549 F.2d 15 (7th Cir. 1977),

- 13 -

United States v. Freeman, 532 F.2d 1098 (7th Cir. 1976), and United States v. Jones, 54

F.3d 1285 (7th Cir. 1995), for the proposition that a separate list of items to be seized must

be incorporated into the face of the warrant by reference in order for the warrant to satisfy

the particularity requirement.   However, their reliance on these cases is misplaced.

Although these cases stand for the proposition that particularity may be provided by a

separate list that has been properly incorporated by reference where the warrant itself

contains only a general description, none of them involved a situation where the detailed

list was physically appended to the warrant itself.   Where, as here, there was a detailed

description of items to be seized that was physically appended to the warrant when issued

and served, the question of whether or not the list was incorporated by reference is

irrelevant.   *See* Jones, 54 F.3d at 1290-91 (noting that if the affidavit had been physically

appended, the inquiry would end there); In re: Search of the Office of Ken Tylman,

Worldwide Financial Services, 913 17th Street, Charleston, IL 61920, 245 F.3d at 981.

      L.     Fruit of the Poisonous Tree

      Defendants argue that the first two warrants were invalid because they did not have

a list of particular items to be seized, and also argue that because the first two warrants

were invalid, the third warrant became "fruit of the poisonous tree."

      First, Defendants have completely misconstrued the fruit of the poisonous tree

doctrine.  "Evidence which is obtained as a result of an illegal arrest [or search] is fruit of

the poisonous tree and it must be excluded unless the government can show that it was

obtained as a result not of the illegality, but rather 'by means sufficiently distinguishable to

be purged of the primary taint.'" Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407,

9 L.Ed.2d 441 (1963). The evidence may be purged of the taint by a finding that it was discovered by an independent source, that it would inevitably have been discovered without the unlawful search, or that its discovery is sufficiently distant in causal connection from the illegal search so as to attenuate the connection between the two. United States ex rel. Owens v. Twomey, 508 F.2d 858 (7th Cir.1974). The goal of the "poisonous tree" doctrine is to ensure that the prosecution is not put in a better position by means of the illegality, but the countervailing consideration is that the prosecution must not be put in a worse position. Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

The Government responds that, even assuming that the first two warrants were invalid, the agents did not search the premises prior to obtaining the third warrant. Rather, they merely videotaped and diagramed the offices, labeled items such as file cabinets, and told the occupants that they were free to leave. The Seventh Circuit found earlier in this case that such conduct does not constitute a "search" for purposes of the Fourth Amendment. *See* In re the Search of the Office of Ken Tylman, Worldwide Financial Services, 245 F.3d 978, 979 (7th Cir. 2001). Moreover, even if this conduct constituted a warrantless search, "it is well established that the inevitable discovery rule provides exception to the exclusionary rule's requirement that evidence tainted by official wrongdoing be suppressed. If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." United States v. Gravens, 129 F.3d 974, 979 (7th Cir. 1997), *citing* Nix, 467 U.S. 431. As the third, lawful and complete warrant issued in a matter of

hours, it is fair to say that the discovery of the evidence would have been inevitable and was not warrantless. Accordingly, the fruit of the poisonous tree doctrine does not help the Defendants here.

M.    Overbreadth

Defendants contend that the warrant was overbroad and essentially allowed a general search of separate business entities. The Government responds that a warrant meets the particularity requirements if it provides a description from which a reasonable officer can ascertain and identify the place to be searched. United States v. Nafzger, 965 F.2d 213, 215 (7th Cir. 1992). Here, the search warrant indicated that the place to be searched was:

> [T]he premises known as: Business property located at 913 17th Street, Charleston, Illinois 61920. The premises contain a one-story wood frame building painted white in color. Dark Gray or black colored shingles cover the roof. On the front of the building, the side which faces 17th Street, is a window which has a sign that says 'Worldwide Financial Services.' The front of the building also has what appears to be a garage door opening which was paneled over and converted into a window. The door to enter the building is on the south side of the building just off the front of the building.

Where a search involves a building with multiple, separate units, "the warrant must specify the precise unit that is the subject of the search to satisfy the particularity requirement." United States v. White, 416 F.3d 634, 637 (7th Cir. 2005), *citing* Jacobs v. City of Chicago, 215 F.3d 758, 767 (7th Cir. 2000). Despite Defendants' ardent protestations to the contrary, it was not evident on March 31, 2000, (nor has it been clearly established in these proceedings) that the various offices within the building at 913 17th Street were separate, independent businesses. As discussed elsewhere in this opinion,

there is no indication that a multiple unit character was externally apparent, as there is no evidence that there were separate signs outside the building identifying multiple business occupants, separate business entrances, or that there were signs inside the building designating separate businesses. There was a single sign identifying "Worldwide Financial Services" at the outside entrance. The various offices were inter-connected and operating on a joint computer network. Where the outer door of a multi-unit business was labeled as if it were the door for only one unit, and "the division of the interior into separately numbered suites was obscure," the Seventh Circuit has held that there was no Fourth Amendment violation. United States v. Stefonek, 170 F.3d 1030, 1032 (7th Cir. 1999).

The Supreme Court has held that "the validity of a warrant must be judged on the basis of the information available at the time that the warrant issued." Id., at 637-38. Where the investigation produced a reasonable belief that there was only one unit, the warrant has been held to be valid even when that belief turns out to have been mistaken. Id., at 638. Put another way, "[t]here is an exception to this general rule where the multiple unit character of the premises is not externally apparent and is not known to the officer applying for or executing the warrant." Maryland v. Garrison, 480 U.S. 79, 82 at n. 4 (1987). Thus, as the Court has found that the purported multiple-unit character of the building was not established or apparent at the time of the search either externally or internally, Defendants have not demonstrated that the warrant failed to describe the premises with particularity or that the agents knew or should have know that the warrant was overbroad. Id.

To the extent that Defendants suggest that the list of items to be seized was not sufficiently particular, their argument is similarly unavailing.  The Fourth Amendment requires that search warrants describe the items to be seized with particularity.  Russell v. Harms, 397 F.3d 458, 464 (7th Cir. 2005).  "Although the Fourth Amendment requires that a search warrant describe the objects of the search with reasonable specificity, it need not be elaborately detailed."  Id., *citing* United States v. Jones, 54 F.3d 1285, 1290 (7th Cir. 1995).  Rather, the level of specificity must only be such that "the officers executing the warrant are able to identify the things to be seized with reasonable certainty."  Id. Furthermore, if detailed language is not possible under the circumstances, "generic language is permissible if it particularizes the types of items to be seized."  Id., *citing* United States v. Hall, 142 F.3d 988, 996 (7th Cir. 1998).

Here, the list attached to the third warrant identified the items to be seized as:

> property that constitutes instrumentalities, fruits, or evidence of the commission of the offenses of conspiracy to defraud the Internal Revenue Service, wire fraud, money laundering, tax evasion, making or subscribing to tax returns which are false as to a material matter, aiding or assisting in the preparation of tax returns containing material misstatements . . . including: (1) business records related to the operation of WorldWide Financial Services including but not limited to financial summaries, financial worksheets, client lists, client portfolios, client files, client financial information, client account statements, client transaction summaries and any documents indicating the transfer of assets to or from any client; (2) Aegis Financial Group and WorldWide Financial Services promoter/representative lists, portfolios, files, financial information, account statements, etc.; (3) copies of federal and state income tax returns and related documents for WorldWide Financial Services and client which relate to the use of an Aegis trust system including tax preparation instructions, tax preparation schedules, Forms 1099, worksheets, and interview notes for the tax years 1994, 1995, 1996, 1997, 1998 and

- 18 -

1999; (4) copies of federal and state fiduciary income tax returns for trusts and related documents; (5) contractions, applications, agreements, and memoranda between any clients and Aegis associates relating to Aegis trusts; (6) financial and banking records for Aegis clients regarding the use of Aegis trusts; (7) financial and banking records for the domestic trusts, foreign trusts and other foreign entities created on behalf of Aegis clients; (8) documents constituting, listing, and describing domestic trust or other foreign entities created on behalf of clients regarding the use of Aegis trusts; (9) copies of foreign and domestic trust contracts, directors manuals, extracts, indentures, agreements, certificates, minutes of the trust meetings, bylaws, and trust correspondence pertaining to trusts created, controlled or managed by Edward Bartoli, Robert Hopper, Michael Vallone, Shawn Dunn, William Cover, Ken Tylman, or any other Aegis associate; (10) correspondence to or from any Aegis principal, client, associate or promoter; and (11) records including invoices, checks, wire transfers, and other documents, relating to payments made by or on behalf of Edward Bartoli, Robert Hopper, Michael Vallone, Shawn Dunn, Aegis Financial Group, Heritage America, Heritage Assurance Group, Parcorp, Worldwide Financial Services, Ken Tylman or any associate
. . . .

Given that this was a complex financial investigation, the warrant had to be broad enough to address the circumstances. The third warrant was supported by a very lengthy and detailed affidavit that provided probable cause to believe that WFS was being used as a cover to implement the Aegis system of fraudulent trusts (Affidavit ¶ 94), that the premises was used for the storage of trust documents (Id., at ¶ 98), that Microsoft PowerPoint presentations were involved (Id., at ¶100), and that other things inherent in the nature of the fraud alleged suggested the legitimate need to cast a wide net in this search. The Court therefore concludes that the warrant and list of items to be seized was sufficiently particular under the circumstances of this case.

N.     Federal Rule of Criminal Procedure 41

Defendants cite Fed. R. Crim. P. 41(c) as it appeared in 2000 in support of their argument that the failure to comply with Rule 41(c) requires suppression in this case.  As it appeared in 2000, Rule 41(c) provided:

> Before ruling on a request for a warrant the federal magistrate judge or state judge may require the affiant to appear personally and may examine under oath the affiant and any witnesses the affiant may produce, provided that such proceedings shall be taken down by the court reporter or recording equipment and made part of the affidavit.

Although Agent Coleman testified that he gave an oath and answered the Magistrate Judge's questions in obtaining the warrants in this case, it is likely that Defendants have misinterpreted this testimony with respect to the standard process of requesting and issuing a warrant.  In applying for a warrant, agents generally appear in person with a written affidavit in support of the warrant application and are always required to swear that the contents of the affidavit are true to the best of their knowledge, which is entirely different from the situation where an agent dispenses with a detailed written affidavit and proceeds to provide the factual basis for the probable cause finding through oral testimony.  Based on a review of the advisory committee notes indicating that the intent was to facilitate the process of obtaining a warrant by telephone, it is the latter situation that the Court believes the cited provisions of Rule 41(c) (now 41(d)) was intended to address rather than the routine situation where an agent simply affirms the truthfulness of a written affidavit.

Moreover, even assuming that Rule 41's recording requirement was somehow applicable in this case, the Supreme Court has held that rules of procedure are not to be applied to effect a "statutory expansion of the exclusionary rule."  United States v.

<u>Calandra</u>, 414 U.S. 338, 348 (1974).  In other words, "foibles in the administration of Rule 41 are not grounds for exclusion."  <u>United States v. Hornick</u>, 815 F.2d 1156, 1158 (7th Cir. 1987), *citing* <u>United States v. Jones</u>, 518 F.2d 384, 387-88 (7th Cir. 1975); <u>United States v. Harrington</u>, 504 F.2d 130 (7th Cir. 1974).  Only where a defendant can show prejudice or that there was an intentional or deliberate disregard of the requirements may suppression be warranted, and neither has been established here.  <u>United States v. Kelly</u>, 14 F.3d 1169, 1173 (7th Cir. 1994).

     O.    <u>Inventory Return</u>

Defendants take issue with the fact that Coleman did not personally supervise the making of the inventory and did not allow Tylman to be present for the preparation of the inventory in violation of the prior version of Rule 41(d) (now Rule 41(f)).  Again, Defendants have misconstrued the requirements of the rule, which provides:

> An officer present during the execution of the warrant must prepare and verify an inventory of any property seized.  The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken.  If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person.

It is apparent from reading the rule that there was no requirement that Coleman personally supervise the preparation of the inventory.  Staggs testified that Agent Jeff Anderson was responsible for preparing the inventory and that Staggs was there to observe the process (6/26/07 Transcript at 70) Although Tylman was present in the lobby, the Court finds no fatal error warranting suppression from the fact that the agents chose to proceed pursuant to the last sentence in Rule 41(d) (now Rule 41(f)(1)(B)) and prepare the

inventory outside of his presence and in the presence of another credible person, namely Staggs.  *See* In re the Search of the Office of Ken Tylman, Worldwide Financial Services, 245 F.3d at 981.  The Court would further note that suppression would not be warranted in any event under the precedent and reasoning set forth in Section N of this Order.

Defendants also take issue with the lack of specificity in the inventory of items seized.  Specifically, they complain that videotapes and floppy discs were referred to generally as "miscellaneous VHS tape[s]" and "miscellaneous computer diskettes" rather than being stated more specifically as "59 video tapes" or "363 computer diskettes," and that some cash and other items that were seized were not listed at all.  While in a perfect world, the inventory would have been prepared with more specificity and without the omission of any items, the Court finds that the inventory prepared in this case was adequate.  Moreover, even if the inventory was found to be inadequate, it would likewise not warrant suppression under the precedent and reasoning set forth in Section N of this Order.

P.    Seizure of Computers

Defendants argue at length that the agents had no authority to remove the computers from the premises and failed to follow an established protocol for purposes of the search of the computers.  In support of this argument, Defendants cite In re: Search of 3817 W. West End, First Floor, Chicago, Illinois 60621, 321 F.Supp.2d 953 (N.D.Ill. 2004), in which the magistrate judge did require the Government to provide a detailed search protocol prior to searching computers.  However, with all due respect, that case is not

binding on this Court, is without merit, and has been ignored by other courts addressing the same issue.

The Court is unaware of any provision in the law that would require agents to conduct an on-site inspection of the contents of the computers and copy only obviously responsive files and documents.  Such a requirement would simply not be practical and would almost certainly be more intrusive into the privacy of the computer owners; it could take weeks to complete this process in a case with a large volume of documents, while the computers in this case were removed, imaged, and returned within a few business days.  Moreover, the imaging and searching of computer hard drives at off-site locations has been upheld in numerous cases based on the practical realities of such searches.  *See* United States v. Hill, 459 F.3d 966, 973-78 (9th Cir. 2006); United States v. Grimmett, 439 F.3d 1263, 1268-70 (10th Cir. 2006); United States v. Upham, 168 F.3d 532, 535-36 (1st Cir. 1999).  How a search warrant is to be executed is normally left to the discretion of the agents, and the exercise of that discretion remains subject to a subsequent review for reasonableness.  The Court sees no reason why the same logic and policy should not apply with respect to computer searches.

Nor does the Court find any validity in the argument that in order to search computer files for items that are identified in the search warrant, agents are required to obtain a second, separate search warrant.  United States v. Adjani, 452 F.3d 1140, 1151 (9th Cir. 2006).  As the Court explained during the evidentiary hearing, the judicial review of documents seized to which the Defendants contend they are entitled does not occur during the search process, but rather post-search when the Government attempts to introduce

such documents for purposes of trial.  At that time, Defendants are entitled to object to the admissibility and relevance of such documents, and the Court will address their objections.

Finally, Defendants argue that the agents did not comply with IRS procedures for searching computer equipment.  It is well-established that the exclusionary rule does not extend to violations of statutes or regulations.  United States v. Kontny, 238 F.3d 815, 818 (7th Cir. 2001); United States v. Caceres, 440 U.S. 741, 755 (1979).

Q.    Seizure of Non-Responsive Documents

Defendants argue that the agents removed thousands of documents unrelated to the descriptions set forth in the warrant, affidavit, or attachment.  They then offer their calculations estimating that as many as 88.5% of all items seized were not related to the Aegis investigation.

Calculations based on self-serving or skewed interpretations of the parameters of the search or what is "relevant" are not helpful.  Defendants have obviously construed the parameters of the search to include only items bearing the words "Aegis" or which are directly related to Aegis.  However, this construction is not reasonable.  The affidavit in support of the application for search warrant clearly indicated that WFS was being used as a vehicle to implement fraudulent Aegis trusts, that Tylman had four employees, and that he used a lawyer and a CPA to offer a wide range of services.  This justified a broad search into the operations of WFS that was not confined to items directly linked to Aegis, and the fact that some items obtained in the search may not fall within the properly drafted scope of the warrant does not justify the suppression of those items that did.

R.     Good Faith

Defendants contend that suppression is required because the agents acted in bad faith.  In United States v. Leon, 468 U.S. 897, 908, 911-12 (1984), the Supreme Court recognized an exception to the exclusionary rule that does not require the suppression of the fruits of an illegal search where the agents acted in objective good faith.  However, in this case, we do not reach the good faith exception of Leon unless the third warrant was fatally defective, and the Court has now rejected any such argument.

Even assuming *arguendo* that it was necessary to reach the question of good faith, the Court would conclude that the agents' conduct upon entry through the execution of the third warrant was reasonable.  The reasonableness of this conduct is illustrated by the fact that the agents abstained from searching for roughly seven hours until a satisfactory warrant was actually obtained.  *See* In re the Search of the Office of Ken Tylman, Worldwide Financial Services, 245 F.3d at 981.

S.     Role of the Magistrate Judge

Defendants assert that the Magistrate Judge abandoned his neutral and detached role, effectively rubber stamping the requests presented to him.  It is obvious that the process of obtaining a proper warrant was neither seemless nor without error in this case. That being said, the record simply does not support a finding that the Magistrate Judge was not neutral and detached or that he abdicated his responsibilites.  It has now been established what was shown to the Magistrate Judge at each application for warrant, and the record indicates that this information was in fact read and considered by the Magistrate Judge.  While ideally the Magistrate Judge would have noticed that the list of items to be

seized was not appended to the first warrant, the record indicates that he read and considered the application and supporting documents as illustrated by his careful amendments by interlineation with respect to the second warrant.

Defendants make much of the fact that the Magistrate Judge issued the third warrant a very short time after being presented with the application. As the affidavits submitted in support of the various warrants were functionally similar, it is fair to infer that by the time he was presented with the third warrant, the Magistrate Judge should have had some familiarity with the lengthy affidavit. The record reveals that the Magistrate Judge had 15-20 minutes to consider the application and supporting documents prior to the time he signed it, which the Court finds to have been sufficient to allow a fair examination.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Suppress [#54] is DENIED, and Subpart A of Winters' Motion to Dismiss [#47] is also DENIED.

ENTERED this 22nd day of August, 2007.


_____
s/ Michael M. Mihm
Michael M. Mihm
United States District Judge

- 26 -